UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SARAH RAYNE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-00076-JPH-DML |
| | ) | |
| WILLIAM GANNON in his individual | ) | |
| capacity, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

After being arrested on an open warrant, Sarah Rayne spent the weekend

in jail.  She consistently complained of pain, so several nurses examined her.

The nurses were not authorized to diagnose patients or prescribe drugs, but

they checked Ms. Rayne's vital signs, gave her ibuprofen for her pain, and

scheduled her for an x-ray that Monday.  On Monday, Ms. Rayne was

transported from the jail to another custodial facility.  A staff member there

immediately called an ambulance to take her to the hospital, where she was

diagnosed with MRSA.

Ms. Rayne argues that Defendants provided unconstitutionally deficient

medical care.  All parties have moved for summary judgment.  For reasons set

forth below, Trooper Gannon's and Sheriff John Layton's motions for summary

judgment are **granted**, dkt. [123]; dkt. [125], Ms. Rayne's motion for partial

summary judgment is **denied**, dkt. [118], and the Medical Defendants' motion

for summary judgment is **granted in part and denied in part**, dkt. [130].

1

# I.
# Facts and Background

The parties have filed cross-motions for summary judgment, so the Court takes the motions "one at a time." *American Family Mut. Ins. v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016). For each motion, the Court views and recites the evidence and draws all reasonable inferences "in favor of the non-moving party." *Id.*

## A. Ms. Rayne is Arrested by Trooper Gannon

On March 10, Trooper William Gannon found Ms. Rayne standing on the shoulder of the interstate, shoeless and crying. Dkt. 118-47 at 17:3-24, 19:10-16. Trooper Gannon invited Ms. Rayne to sit in the front passenger seat of his vehicle and started a conversation with her. *Id.* at 20:23-21:25. Trooper Gannon ran a license check and discovered that there was an open warrant for Ms. Rayne's arrest. *Id.* at 23:21-24:1. He then handcuffed her. *Id.* at 26:4-15.

On route to the Marion County Jail (the "Jail"), Ms. Rayne mentioned that her shoulder hurt. *Id.* at 27:18-22, 28:5-8, 29:5-12. Ms. Rayne was not wearing the shoulder immobilizer that she had been prescribed during a recent visit to the hospital. Dkt. 130-1 at 68:24-25. Trooper Gannon asked her several times if she needed an ambulance or wanted to go to the hospital, but she declined. Dkt. 118-47 at 30:1-31:7. He also asked her if she wanted him to handcuff her with two linked sets of handcuffs, but she declined that offer as well. *Id.* at 30:5-12. About fifteen minutes later they arrived at the Jail. *Id.* at 32:4-7, 42:6-44:7.

**B. Ms. Rayne's Arrival at the Jail**

Trooper Gannon informed Jail staff that Ms. Rayne was complaining of shoulder pain and removed the handcuffs. *Id.* at 32:4-7, 42:6-44:7. The Jail had an agreement with Correct Care Solutions, LLC, to provide healthcare to inmates at the jail. *See* dkt. 118-48. Trooper Gannon left the Jail, knowing that the Jail had medical staff onsite for evaluating inmates. *Id.* at 32:4-7, 42:6-44:7.

Ms. Rayne was booked into the Jail around 4:00 p.m. Dkt. 118-4. On weekends, nurses provide medical services at the Jail. Dkt. 130-8, ¶ 2. Nurses are not authorized to diagnose patients or prescribe drugs; only doctors and nurse practitioners can do that. Dkt. 118-44 at 51:10-18. Doctors and nurse practitioners are on-call over weekends if the nurses believe additional guidance is needed to treat a patient. Dkt. 130-8, ¶ 2. Nurses have discretion in choosing whether to contact a physician or nurse practitioner regarding an inmate's treatment. *See* dkt. 118-44 at 102:15-20, 109:24-10:1-4; dkt. 118-45 at 48:8-14.

**C. Ms. Rayne is Seen by Multiple Nurses Over Three Days**

Over the next three days, Ms. Rayne was seen and examined by multiple nurses. *See* dkt. 130-6. Nurse Pierce called Dr. Buller to ask about Ms. Rayne's prescription for her kidney infection, dkt. 130-7, ¶¶ 4-5, and Nurse Jones called Nurse Practitioner Cheryl Petty to discuss Ms. Rayne's shoulder pain, dkt. 130-14, ¶ 3. No other nurse who saw Ms. Rayne sought assistance from a doctor or nurse who could diagnose Ms. Rayne or prescribe drugs. *See*

3

dkt. 130-7, ¶ 6; dkt. 130-9; ¶ 6; dkt. 130-10, ¶ 5; dkt. 130-11, ¶ 5; dkt. 130-12, ¶ 4; dkt. 130-14, ¶ 5; dkt. 130-15, ¶ 5.

The designated evidence related to each encounter between Ms. Rayne and a physician, nurse, or nurse practitioner is summarized below.

### 1. Nurse Teresa Pierce and Dr. Buller

Around 5:00 p.m. on March 10—the day Ms. Rayne was booked into the Jail—Nurse Teresa Pierce assessed Ms. Rayne after she complained of chest pain.  Dkt. 130-6 at 28; dkt. 130-7, ¶ 3.[1]  Nurse Pierce took Ms. Rayne's vital signs and checked her breathing.  Dkt. 130-6 at 28; dkt. 130-7, ¶ 3.  Ms. Rayne did not complain about shoulder pain during this encounter.  Dkt. 130-6 at 28; dkt. 130-7, ¶ 3.  Nurse Pierce noted that Ms. Rayne was on a prescription drug for a kidney infection, dkt. 130-6 at 29, and called Dr. Buller about Ms. Rayne's prescription for that condition, dkt. 130-7, ¶¶ 4-5.  Dr. Buller ordered Ms. Rayne a new antibiotic for her kidney infection.  Dkt. 130-6 at 21.  Nurse Pierce did not observe any signs of an infection such as redness, swelling, an abscess, or elevated temperature.  Dkt. 130-7, ¶ 4.

### 2. Nurse LaQuetta Hubbard

The next morning—Saturday, March 11—Nurse LaQuetta Hubbard assessed Ms. Rayne.  Dkt. 130-6 at 1-5, 30-35.  Ms. Rayne reported that she did not use drugs that were not prescribed by a physician.  *Id.* at 31.  She also

---

[1] Ms. Rayne claims that her medical records may be inaccurate because the some of the some of the defendants do not remember completing these records or interacting with Ms. Rayne. Dkt. 148 at 5-7.  But Ms. Rayne has provided no reason for the Court to conclude these records have been forged or altered, and she cited portions of them in support of her motion, so the Court will consider them.

reported that she had a history of heroin abuse, but that she had not gone through withdrawal since January of 2017. *Id.*

Nurse Hubbard noted that Ms. Rayne complained of pain in her right shoulder. *Id.* at 1. Ms. Rayne's vital signs were all within normal limits, and she did not have a fever. *Id.* at 3; dkt. 130-9, ¶ 3. Ms. Rayne's breathing and movement were normal, and there were no obvious lesions or draining wounds on her arms. Dkt. 130-9, ¶ 4. In response to Ms. Rayne's complaints about shoulder pain, Nurse Hubbard scheduled an x-ray to be performed on Monday, March 13. *Id.*; dkt. 130-6 at 40-41. Nurse Hubbard did not observe any signs of infection during either assessment. Dkt. 130-9, ¶ 4. Nurse Hubbard was not provided with any information about Ms. Rayne's complaints from Trooper Gannon. Dkt. 118-45 at 25:24-26:16.

### 3. Nurse Amber Allen

Around 3:00 p.m. on March 11, Nurse Amber Allen assessed Ms. Rayne because she was holding her right arm and "crying out in pain." Dkt. 130-6 at 27. Nurse Allen took Ms. Rayne's vital signs, which were normal with a slightly elevated pulse. *Id.*; dkt. 130-10, ¶ 3. She gave Ms. Rayne ibuprofen and recommended that the next shift assess Ms. Rayne too. Dkt. 130-6 at 27. Nurse Allen saw no signs of infection such as redness, swelling, an abscess, or an elevated temperature. Dkt. 130-10, ¶ 3. Nurse Allen believed the shoulder pain was probably a "musculoskeletal problem" and the already-scheduled x-ray was the first step in diagnosing the problem. *Id.* The designated evidence

5

does not indicate whether Nurse Allen reviewed the medical record entries from the nurses who had previously seen Ms. Rayne.

### 4. Nurse Brian Carter

Around 7:30 p.m., Ms. Rayne was placed in the suicide-watch cell after she said that she was going to "start beating [her] arm on these bars and [she] might as well kill [herself]." Dkt. 118-13. Detention Deputy Madonna Edgemon helped Ms. Rayne remove her clothes because Ms. Rayne had stated that she could not remove them herself. *Id.* Deputy Edgmon requested that Ms. Rayne speak with mental health and be placed in suicide segregation. *Id.* Deputy Edgemon recorded this note in the Jail's Offender Management System ("OMS").

Less than an hour later, Nurse Brian Carter was helping a different patient when he noticed Ms. Rayne on the floor of her cell saying she needed to go to the hospital because of pain in her neck, shoulder, and chest. Dkt. 130-6 at 26. He evaluated Ms. Rayne and took her vital signs, all of which were normal. *Id.*; dkt. 130-11, ¶ 3. He saw no signs of infection or distress such as redness, swelling, an abscess, or an elevated temperature. Dkt. 130-11, ¶ 3. The designated evidence does not indicate whether Nurse Carter reviewed the medical record entries from the nurses who had previously seen Ms. Rayne, whether he knew that Ms. Rayne was unable to remove her clothes without help, or why Ms. Rayne was placed in the suicide watch-cell.

### 5. Nurse Daniel Gebresilassie

Shortly after Nurse Carter evaluated Ms. Rayne, Nurse Daniel Gebresilassie administered her prescription.  Dkt. 130-6 at 24.  Ms. Rayne complained of having right shoulder pain so Nurse Gebresilassie took her vital signs, which were again normal with a slightly elevated heart rate.  *Id.* at 25. During this assessment, Ms. Rayne looked anxious and was "talking fast, kind of screaming," dkt. 118-52 at 72:4-6, but Nurse Gebresilassie saw no signs of infection, dkt. 130-12, ¶ 3.  Nurse Gebresilassie checked Ms. Rayne's chart to confirm that she had not recently been given medication that would contradict the ibuprofen, gave Ms. Rayne ibuprofen, and noted that he would continue to monitor her.  Dkt. 130-6 at 25; dkt. 130-13 at 11-12.

### 6. Nurse Cyrilene Jones and Nurse Practitioner Cheryl Petty

The next morning—Sunday, March 12—Nurse Cyrilene Jones was called to clean a wound on Ms. Rayne's head caused by her repeatedly bumping her head on the wall of her cell.  Dkt. 118-43 at 49:3-15; dkt. 130-6 at 23.  Nurse Jones also took Ms. Rayne's vital signs, which were normal.  Dkt. 118-43 at 44:22-24; dkt. 130-6 at 23.  During the assessment, Ms. Rayne complained of shoulder pain, so Nurse Jones examined the shoulder and found that it was slightly swollen.  Dkt. 118-43 at 45:2-46:1; dkt. 130-6 at 23.  Nurse Jones did not see any other signs of infection.  Dkt. 130-14, ¶ 4.

Nurse Jones then reviewed Ms. Rayne's chart and noticed that she had complained of shoulder pain the day before and was given ibuprofen.  Dkt. 118-43 at 46:2-21.  Unsure of how to proceed, Nurse Jones called the on-call

nurse practitioner, Cheryl Petty.  *Id.* at 47:23-48:5, 55:4.  Nurse Jones told Nurse Petty Ms. Rayne's name and age, that Ms. Rayne was complaining of shoulder pain, that Ms. Rayne had a bruise and scrape on her forehead, and that Ms. Rayne was previously given ibuprofen.  *Id.* at 48:21-49:2.

Nurse Petty advised that because Ms. Rayne's vital signs were normal, Nurse Jones should continue to administer ibuprofen and wait on the x-ray results before doing anything else.  *Id.* at 50:6-9, 52:16-19; dkt. 130-8, ¶ 3. After this discussion, Nurse Jones gave Ms. Rayne ibuprofen.  Dkt. 130-14, ¶ 3.

Shortly thereafter, Ms. Rayne was moved to a cell with a camera.  Dkt. 118-19.  Deputy Smith observed Ms. Rayne lying on the ground of her cell and attempting to bang her head on the toilet.  *Id.*  Deputy Smith informed Ms. Rayne that if she continued to do so, she would be placed in a padded cell for her safety.  *Id.*  Deputy Smith recorded her observations in the Jail's OMS.  *Id.*

### 7. Nurse Jamie Marble

Around 6:40 the next morning—Monday, March 13—Deputy Tyler notified medical that Ms. Rayne's arm was swollen.  Dkt. 118-23.  When Nurse Jamie Marble arrived at Ms. Rayne's cell, Ms. Rayne was sitting on her bunk, crying out in pain.  Dkt. 130-6 at 22.  Nurse Marble recognized that Ms. Rayne was "in a significant amount of pain."  Dkt. 118-46 at 89:8-13.  Nurse Marble saw that Ms. Rayne's arm was swollen, but she did not observe any abscess, hyperventilation, or other signs of serious distress.  Dkt. 130-15, ¶ 3.  Nurse Marble looked at the progress notes, saw Nurse Petty's standing order for

8

ibuprofen, gave Ms. Rayne ibuprofen, and noted that she was scheduled for an x-ray that day.  *Id.*

Later that morning, Megan Andrews, mental health staff, completed Ms. Rayne's suicide watch discharge.  Dkt. 118-27.  Ms. Andrews noted that her right arm was swollen.  *Id.* at 3.  Ms. Andrews spoke with Roxanne Mann in the medical clinic and Ms. Mann informed her that Ms. Rayne was scheduled for an x-ray that day.  *Id.*  Deputy Tyler noted that Ms. Marble stated that she would schedule an appointment for Ms. Rayne to see a doctor.  Dkt. 118-23.

### 8. Nurse Cyrilene Jones

Nurse Jones saw Ms. Rayne again on Monday morning between 9:00 and 10:00 a.m. during the medication pass.  Dkt. 130-14, ¶ 4; dkt. 130-6 at 18.  Ms. Rayne made similar complaints about her shoulder and Nurse Jones did not conduct any further assessment.  Dkt. 118-43 at 117:17-118:1-13.

### D. Ms. Rayne Leaves the Jail and Goes to the Hospital

The x-ray scheduled for 8:00 a.m. Monday at the Jail, dkt. 130-6, was not done because Ms. Rayne was transferred that morning to the Marion County Community Corrections facility (the "MCCC"), dkt. 164 at 12; dkt. 118, at 28-29.  The MCCC does not have any medical staff on-site.  Dkt. 118-35, ¶ 8.  If a person in MCCC custody needs medical care, the only remedy is calling an ambulance.  *Id.*

When Ms. Rayne arrived at the MCCC, an MCCC employee called an ambulance after noticing that Ms. Rayne's arm looked swollen and red.  *Id.*, ¶ 10.  Ms. Rayne told the medical personnel that she had used heroin two weeks

9

before and injected herself multiple times in the same area.  Dkt. 118-31 at 1.

She also told the hospital staff that she had injected herself using dirty needles

the week before.  Dkt. 118-50 at 1.  Eventually, she was diagnosed with and

treated for a serious MRSA infection.  *Id.* at 5-6; dkt. 130-1 at 41:11-13,

112:23-113:1.

### E. Ms. Rayne's Medical Condition and Treatment Immediately Before Her Arrest

Unknown to the nurses who treated Ms. Rayne at the Jail,[2] around the

time she was arrested, Ms. Rayne was an intravenous drug user.  Dkt. 130-2 at

21; dkt. 130-1 at 37:21-39:24, 51:19-25.  The week she was arrested, Ms.

Rayne injected herself with methamphetamine using a needle that had been

shared with other users.  Dkt. 130-1 at 41:4-10.  She had also recently

"muscled" heroin by injecting it directly into her muscles.  *Id.* at 52:3-5, 54:4-9;

dkt. 118-50 at 6.  Muscling heroin is known to cause infections.  Dkt. 130-19

at 4.

Two days before her arrest—on March 8, 2017—Ms. Rayne went to the

hospital because she had a fever and shoulder pain; she was diagnosed with a

kidney infection.  Dkt. 130-1 at 51:19-21, 52:6-17.  The next day—March 9—

Ms. Rayne went to a hospital again complaining of shoulder pain after using

heroin since her visit the day before.  *Id.* at 53:25-54:9.  At that time, her

---

[2] Ms. Rayne did not tell any of the nurses who saw her that she had been to the hospital on day she was booked into the Jail, and twice in the two previous days.  *See* dkt. 130-7, ¶ 7; dkt. 130-9, ¶ 7; dkt. 130-10, ¶ 6; dkt. 130-11, ¶ 6; dkt. 130-12, ¶ 5; dkt. 130-14, ¶ 6; dkt. 130-15, ¶ 6.  Nor did she tell them about the x-ray of her shoulder on March 8, two days before being booked into the jail; diagnoses made during those visits; or her use of shared needles.  *See* dkt. 130-7, ¶ 7; dkt. 130-9, ¶ 7; dkt. 130-10, ¶ 6; dkt. 130-11, ¶ 6; dkt. 130-12, ¶ 5; dkt. 130-14, ¶ 6; dkt. 130-15, ¶ 6.

shoulder had no swelling, bruising, warmth, or redness, and had a full range of motion.  Dkt. 130-4 at 12.  An x-ray of the shoulder came back normal.  *Id.* at 13.

On the morning of her arrest—Friday, March 10—Ms. Rayne went to the hospital with the same complaints.  *Id.* at 4-6; dkt. 130-1 at 58:4-19.  She was diagnosed with a shoulder strain and was told to wear a shoulder immobilizer.  Dkt. 130-4 at 15.

**F. Expert Reports**

The Medical Defendants[3] submitted the expert report of Dr. Emily Frank.  Dkt. 130-19.[4]  Dr. Frank concluded that the "medical care that Ms. Rayne received at the Marion County Jail was objectively reasonable and within the community standard of care."  *Id.* at 4.  She opined that it is likely that Ms. Rayne's arm looked "significantly worse" when she arrived at the hospital because certain infections caused by using dirty needles take several days to appear.  *Id.*  Dr. Frank believes Ms. Rayne is to blame for not being diagnosed with an infection sooner because she did not tell anyone at the Jail that she had been muscling heroin using dirty needles.  *Id.* at 3-4.

Ms. Rayne submitted the expert report of Nurse Terry Fillman.  Dkt. 145-4.[5]  He concluded that the medical care Ms. Rayne received at the Jail "fell

---

[3] The Medical Defendants are nurses Amber Allen, Teresa Pierce, La Quetta Hubbard, Daniel Gebresilassie, Brian Carter, Cyrilene Jones, and Jamie Marble; Nurse Practitioner Cheryl Petty; and Dr. Bryan Buller.
[4] Dr. Frank reviewed Ms. Rayne's medical records from the Jail and each of the hospitals she received treatment.  Dkt. 130-19 at 3.
[5] Dr. Fillman reviewed Ms. Rayne's medical records from the Jail and each of the hospitals she received treatment.  Dkt. 145-4 at 1.

below nursing standards of care." *Id.* at 2.  Nurse Fillman reasoned that the nurses who saw Ms. Rayne in the Jail failed to do "what another reasonable nurse would have done given the same circumstances."  *See id.* at 5.

### G. Procedural History

Ms. Rayne brings claims against the Medical Defendants and Trooper Gannon under 42 U.S.C. § 1983 alleging they provided unconstitutionally deficient medical care.  Dkt. 50, ¶¶ 73-80, 92-101.  She also brings a Section 1983 claim against Sheriff Layton in his official capacity, alleging that the Sheriff's Office is liable under *Monell* for her constitutional injuries.  *Id.,* ¶¶ 102-110.

Ms. Rayne has filed a partial motion for summary judgment on these claims.  Dkt. 118.  Trooper Gannon has also filed a motion for summary judgment, dkt. 123, as have Sheriff Layton, dkt. 125, and the Medical Defendants, dkt. 130.

## II.
## Applicable Law

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify

12

"specific facts showing that there is a genuine issue for trial." *Id.* at 324.  In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).

### III.
### Analysis

**A. The Medical Defendants**

The Medical Defendants argue they are entitled to summary judgment because they provided Ms. Rayne with reasonable medical care.  Dkt. 131.  Ms. Rayne responds that the Medical Defendants wholly ignored her "severe, undiagnosed, and ongoing pain and swelling."  Dkt. 119 at 26.  She asserts that they "were aware of MRSA and the risks inherent therein, but that they consciously disregarded that risk when they failed to get Ms. Rayne immediate medical assistance."  *Id.* at 29.

Medical care claims brought by pretrial detainees under the Fourteenth Amendment are subject to the objective reasonableness standard set forth in *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2468 (2015).  *See Miranda v. Cty. of Lake*, 900 F.3d 335, 351 (7th Cir. 2018).  The Court first considers the intentionality of the defendants' conduct, asking whether defendants "acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [the plaintiff's] case."  *McCann v. Ogle Cty.*, 909 F.3d 881, 886 (7th Cir. 2018) (citing *Miranda*, 900 F.3d at 353).  Negligence or even gross negligence is not enough to establish liability.  *Id.*  The

Court then considers whether the conduct was objectively reasonable. *Id.* (citing *Miranda*, 900 F.3d at 354). This requires the Court "to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Id.*

Indifference to prolonged, unnecessary pain can be the basis for a constitutional violation. Indeed, "[e]ven a few days' delay in addressing a severely painful but readily treatable condition suffices" to implicate the Constitution. *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012).

### 1. Medical Defendants Entitled to Summary Judgment

Nurse Pierce, Dr. Buller, and Nurse Hubbard are entitled to summary judgment because construing the designated evidence in Ms. Rayne's favor, no jury could conclude that they acted unreasonably, let alone purposefully, knowingly, or recklessly when each considered Ms. Rayne's treatment.

### a. Nurse Pierce

Nurse Pierce assessed Ms. Rayne the day she was booked into the Jail in response to her complaints of chest pain. Dkt. 130-6 at 28; dkt. 130-7, ¶ 3. Ms. Rayne denied any cardiac issues or medical conditions. Dkt. 130-6 at 28; dkt. 130-7, ¶ 3. Nurse Pierce checked Ms. Rayne's breathing and took Ms. Rayne's vital signs, which were normal. Dkt. 130-6 at 28; dkt. 130-7, ¶ 3. Ms. Rayne voiced no other complaints and did not complain to Nurse Pierce about her shoulder pain. Dkt. 130-6 at 28; dkt. 130-7, ¶ 3. Nurse Pierce did not

observe any signs of an infection such as redness, swelling, an abscess, or elevated temperature. *Id.*, ¶ 4. Nurse Pierce encouraged Ms. Rayne to take deep breaths and relax. Dkt. 130-6 at 28; dkt. 130-7, ¶ 3. She testified that "based upon [her] records," Ms. Rayne's "symptoms were likely attributed to anxiety." Dkt. 130-6, ¶ 3. Nurse Pierce then charted her notes so other nurses could access them. *Id.*, ¶ 5. Based upon Ms. Rayne's vital signs, presentation, and complaints of chest pain, Nurse Pierce did not believe it was necessary to call a nurse practitioner or physician to procure further medical treatment. *Id.*, ¶ 6. Considering the totality of facts and circumstances, Nurse Pierce's decision was not objectively unreasonable. *McCann*, 909 F.3d at 886.

### b. Dr. Buller

On the day Ms. Rayne was booked into the Jail, Nurse Pierce contacted Dr. Buller about Ms. Rayne's prescription for her kidney infection, *see* dkt. 130-7, ¶¶ 4-5, and Dr. Buller ordered Ms. Rayne a new antibiotic for her kidney infection, dkt. 130-6 at 21. Nothing in this interaction suggests that Dr. Buller acted purposefully, knowingly, or recklessly when he considered Ms. Rayne's treatment, or that his actions were objectively unreasonable. *McCann*, 909 F.3d at 886.

### c. Nurse Hubbard

Nurse Hubbard assessed Ms. Rayne and noted that Ms. Rayne complained of pain in her right shoulder. Dkt. 130-6 at 1-5, 30-35. Ms. Rayne's vital signs were all within normal limits, and she did not have a fever. *Id.* at 3; dkt. 130-9, ¶ 3. In response to Ms. Rayne's complaints about shoulder

pain, Nurse Hubbard scheduled an x-ray to be performed on Monday, March 13.  Dkt. 130-6 at 40-41; dkt. 130-9, ¶ 4.  Nurse Hubbard did not observe any signs of infection during either assessment.  Dkt. 130-9, ¶ 4.  Based upon Ms. Rayne's vital signs, presentation, and complaints of right shoulder and arm pain, Nurse Hubbard did not believe it was necessary to call a nurse practitioner or physician to procure further medical treatment.  *Id.*, ¶ 6.  Considering the totality of facts and circumstances, Nurse Hubbard's decision was not objectively unreasonable.  *McCann*, 909 F.3d at 886.

Ms. Rayne has not designated evidence that creates a genuine issue of material fact as to whether the treatment provided by Nurse Pierce, Dr. Buller and Nurse Hubbard was objectively unreasonable.  *Celotex Corp.*, 477 U.S. at 323-24.  Accordingly, the motions of Nurse Pierce, Dr. Buller, and Nurse Hubbard, for summary judgment are **granted**.

### 2. Medical Defendants Not Entitled to Summary Judgment

Nurses Allen, Carter, Gebresilassie, Jones, Marble, and Nurse Practitioner Petty are not entitled to summary judgment.  The evidence designated by Ms. Rayne creates a genuine issue of material fact as to whether each of these Medical Defendants acted knowingly, recklessly, and unreasonably in response to Ms. Rayne's symptoms and complaints of pain.

#### a. Nurse Allen

When Nurse Allen saw Ms. Rayne on Saturday afternoon, she was holding her right arm and "crying out in pain."  Dkt. 130-6 at 27.  At that point, Ms. Rayne had complained of pain to two other nurses over the last 24

hours. *See* dkt. 130-6. Nurse Allen checked Ms. Rayne's vitals and gave her ibuprofen, *id.* at 27; dkt. 130-10, ¶ 3, but she did not call a physician or nurse practitioner to diagnose the cause of or to treat Ms. Rayne's severe pain, dkt. 130-10, ¶ 5.

### b. Nurse Carter

When Nurse Carter saw Ms. Rayne on Saturday evening, she was on the floor of her suicide-watch cell saying she needed to go to the hospital because of pain in her neck, shoulder, and chest. Dkt. 130-6 at 26. Ms. Rayne was on suicide watch and had previously complained about her pain to three other nurses earlier that day. *See* dkt. 130-6. Nurse Carter checked her vitals but did not call a physician or nurse practitioner. Dkt. 130-11, ¶ 5.

### c. Nurse Gebresilassie

When Nurse Gebresilassie saw Ms. Rayne on Saturday night, her heart rate was elevated, dkt. 130-6 at 24-25, she was talking fast and sort of screaming, dkt. 118-52 at 72:4-6, and had complained to four other nurses of pain, *see* dkt. 130-6. Nurse Gebresilassie did not call a physician or nurse practitioner after assessing Ms. Rayne for her shoulder pain. Dkt. 130-12, ¶ 4.

### d. Nurse Practitioner Petty

Nurse Practitioner Petty spoke to Nurse Jones about Ms. Rayne's condition on Sunday morning. *See* dkt. 130-8, ¶ 3. Although Nurse Petty did not have contact with Ms. Rayne, dkt. 118-44 at 94:3-5, she signed off on most of the assessments, progress notes and medication orders, *see* dkt. 130-6. Nurse Petty testified that she did not remember reviewing Ms. Rayne's

documents that she signed off on, *see* dkt. 118-44 at 82:4-17, and that she did not recall whether she would have looked at any documents before reviewing and signing off on the ibuprofen order, dkt. 118-44 at 127:21-2.

At the time Nurse Jones consulted with Nurse Petty about Ms. Rayne, Ms. Rayne already complained about severe pain to several nurses and had a swollen shoulder. *See* dkt. 130-6. Despite her knowledge of Ms. Rayne's pain and the swelling of Ms. Rayne's shoulder, Nurse Petty continued to prescribe ibuprofen and did not call a physician. *See id.*; dkt. 130-8, ¶ 3.

### e. Nurse Jones

While Nurse Jones contacted the on-duty nurse practitioner when she saw Ms. Rayne on Sunday morning, she did not take any action when Ms. Rayne was still in severe pain the next day. Ms. Rayne complained about shoulder pain when Nurse Jones saw her Monday morning. Dkt. 130-14, ¶ 4; dkt. 130-6 at 18. Despite knowing that Ms. Rayne was still in pain since the assessment on Sunday morning, dkt. 130-6 at 23, Nurse Jones did not take further action, dkt. 118-43 at 118:1-13.[6]

### f. Nurse Marble

Nurse Marble saw Ms. Rayne on Monday morning. Dkt. 130-6 at 22. She recognized that Ms. Rayne was in a significant amount of pain, dkt. 118-46 at 89:8-13, and noticed that Ms. Rayne's arm was swollen, dkt. 130-15, ¶ 3. She knew Ms. Rayne had already been given ibuprofen and gave her more. *Id.*

---

[6] The Court does not assess whether Nurse Jones' treatment of Ms. Rayne, made in accordance with Nurse Petty's order, was objectively reasonable.

She did not contact a physician or nurse practitioner after assessing and observing Ms. Rayne's pain in her right arm. *Id.*

The designated evidence shows that when each of these nurses examined Ms. Rayne, she was in severe pain. Rather than escalating the situation for further diagnosis and treatment, each did nothing further other than following the same ineffective treatment of giving Ms. Rayne ibuprofen. The designated evidence doesn't reveal whether these nurses reviewed the records of Ms. Rayne's medical treatment in the Jail. But if they did, then they had actual knowledge of Ms. Rayne's persistent severe pain. If they didn't, then they made their decisions without knowledge of Ms. Rayne's condition and treatment. Either way, a reasonable jury could find that each nurse's decisions were objectively unreasonable and made purposefully, knowingly, or perhaps even recklessly when considering Ms. Rayne's case. While a jury could reach the opposite conclusion, reaching either conclusion will require making credibility determinations and resolving contested factual issues, functions that are reserved for a jury. *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

Defendants argue that Ms. Rayne is to blame for any suffering she experienced because she failed to disclose her history of drug use and recent hospital visits. Dkt. 131 at 43–49. Defendants contend that they would likely have discovered what was wrong with Ms. Rayne had they known this information. *Id.* Maybe. But the issue is whether they acted reasonably at the time based on the facts that they knew, not whether in hindsight their actions

were reasonable based on what they did not know.  *See McCann*, 909 F.3d at 886.

Defendants also argue that Dr. Frank's report remains undisputed, unchallenged, and dispositive that no act or omission of any Medical Defendant caused or exacerbated Ms. Rayne's MRSA infection.  Dkt. 164 at 27.  But the question is whether the defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of Ms. Rayne's case and whether their conduct was objectively reasonable.  Dr. Frank's report does not individually assess the actions of each Medical Defendant.  *See* dkt. 130-19.  Moreover, the report is primarily focused on Ms. Rayne's medical evaluation and treatment from before she arrived at the Jail, none of which was known to the nurses who saw her at the Jail.  *Id.*  Last, the report is speculative as to how the symptoms that were obvious to intake staff at the MCCC, the paramedics and medical staff at the hospital were apparently undetectable to Nurse Marble and Nurse Jones that same morning.

Accordingly, Nurses Allen, Carter, Gebresilassie, Jones, Marble, and Nurse Practitioner Petty are not entitled to summary judgment.[7]

### B. Trooper Gannon

Trooper Gannon argues that Ms. Rayne cannot show that he was deliberately indifferent to Ms. Rayne's medical needs.  Dkt. 124.  Ms. Rayne

---

[7] The same contested issues of fact that preclude summary judgment for Nurse Allen, Nurse Carter, Nurse Gebresilassie, Nurse Jones, Nurse Marble, and Nurse Practitioner Petty also preclude summary judgment for Ms. Rayne.  Accordingly, Ms. Rayne is not entitled to summary judgment against these nurses.

responds that Trooper Gannon was deliberately indifferent because he failed to take her to the hospital "whether she wanted to go or not."  Dkt. 146 at 6.

Ms. Rayne's burden is to show that Trooper Gannon acted "purposefully, knowingly, or perhaps even recklessly" with respect to the risk of harm. *Miranda*, 900 F.3d at 353-54.  *Terry v. County of Milwaukee* in instructive.  In *Terry*, the court found that a jury could conclude that a correctional officer acted purposefully, knowingly, or recklessly after the officer failed to help a detainee who went into labor and delivered a baby in her jail cell.  357 F. Supp. 3d 732, 741 (E.D. Wis. 2019).  The officer was charged with performing rounds at the jail, but he did not help the detainee after she screamed, yelled for help, banged on the door, activated an emergency light, and ultimately delivered a baby herself.  *Id.* at 748.

Here, Trooper Gannon's actions do not demonstrate that he purposefully, knowingly, or recklessly failed to provide Ms. Rayne with medical care. *McCann*, 909 F.3d at 886.  When Trooper Gannon met Ms. Rayne, he saw no visible injuries.  Dkt. 118-47 at 25:8-25.  He could not see her shoulder because she was wearing a long-sleeve windbreaker that covered the entire shoulder.  Dkt. 123-3 at 69:1-9.  Trooper Gannon was only aware that something may have been wrong with Ms. Rayne after he started to drive her to the Jail and "she started complaining about her shoulder pain."  Dkt. 118-47 at 28:5-8.  Once he heard this complaint, he offered to take her to the hospital, multiple times, but Ms. Rayne refused.  *Id.* at 30:1-31:7.  He offered to call an ambulance for her, but she said no.  *Id.*  He offered to adjust her handcuffs,

21

but she refused again.  *Id.* at 30:5-12.  In addition, Trooper Gannon knew that the Jail had medical staff onsite for evaluating inmates and providing treatment, *id.* at 32:4-7, 42:6-44, and he informed Jail staff that Ms. Rayne was complaining of shoulder pain, *id.* at 43:6-18.

Non-medical defendants are entitled to reasonably rely on the expertise of a medical professional.  *See, e.g., Figgs v. Dawson*, 829 F.3d 895, 903–04 (7th Cir. 2016) (no deliberate indifference where prison administrative staff reasonably relied on expertise of specialized staff).  "Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prison was under a physician's care would strain this division of labor."  *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *see, e.g., Bond v. Aguinaldo*, 228 F.Supp.2d 918, 920 (N.D. Ill. 2002) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.").

In total, Trooper Gannon did not purposefully, knowingly, or recklessly disregard any risk of harm to Ms. Rayne by taking her to the Jail instead of forcing her to go to a hospital against her wishes.  Trooper Gannon's motion for summary judgment, dkt. [123], is **granted**.

### C. Sheriff John Layton

The final defendant, Sheriff John Layton,[8] has also moved for summary judgment, arguing that there is no basis for imposing *Monell* liability on the Sheriff's Office.  Dkt. 126.  Ms. Rayne argues that the Sheriff's Department "maintained a policy which prevented vital and material information from flowing between the medical staff, the mental health staff, and the jail staff.  As a result, multiple pieces of important and valuable information related to Ms. Rayne's condition was included only in OMS records, which were never reviewed by medical staff, and information related to Ms. Rayne's condition was never provided to jail staff in order for jail to staff to monitor their care and control of Ms. Rayne."  Dkt. 147 at 4.  Ms. Rayne also contends that the Sheriff's Department failed to train Jail staff on medical issues and the sufficiency of medical treatment.  *Id.* at 16-17.

### 1. *Monell* Liability Under Section 1983

A municipality cannot be held vicariously liable under section 1983 for the actions of its agent or employee.  *Los Angeles Cty. v. Humphries*, 562 U.S. 29, 35–36 (2010) (explaining *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978)).  Rather, a municipality can be liable only for its own actions and corresponding harm.  *Id.*  "The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself,

---

[8] Lena Anderson joins Sheriff Layton's motion.  Dkt. 126.  While she is listed in the caption in Ms. Rayne's summary judgment motion, dkt. 118, she is not listed as a defendant in the operative complaint, dkt. 50, or in the statement of claims, dkt. 90.  She is therefore no longer a party to this action and is **DISMISSED** from this case.

or is it merely one untaken by a subordinate actor?" *Glisson v. Ind. Dept. of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (*en banc*). An action is one of the "institution itself," *id.*, when the municipality's "official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind [the] constitutional injury." *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *Monell*, 436 U.S. at 658; *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)); *see Humphries*, 562 U.S. at 36 (reciting the "list of types of municipal action" that can lead to liability).

The "stringent" and precise grounds for *Monell* liability are required by section 1983. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 402-404, 415 (1997); *see Humphries*, 562 U.S. at 36. Courts must apply "rigorous standards of culpability and causation" to prevent municipal liability from collapsing into *respondeat superior* liability, which Section 1983 prohibits. *Brown*, 520 U.S. at 405, 415.

## 2. The Sheriff's Policy

Ms. Rayne argues that as a result of the Sheriff's policies and procedures, "the medical staff did not obtain sufficient medical provider attention to address Ms. Rayne's serious medical condition" while she was in the Jail. Dkt. 119 at 35. She contends that pursuant to Correct Care Solution's policies, a member of medical staff needed to flag an inmate for further treatment from a physician or nurse. *Id.* at 33. Medical staff could use their discretion to "1) schedule an appointment with a medical provider days into the future; 2) schedule an immediate appointment with a medical provider;

24

3) call for emergency medical services; 4) call a medical provider for assistance; or 5) follow one of the nursing protocols for regularly seen conditions." *Id.* Medical staff were not permitted to diagnose the inmate, despite being in the best position to do so, having personally interacted with inmate. *Id.* at 34.

A municipality may be liable for actions of a third party when the municipality delegates its responsibilities to the third party. *See King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) ("[A municipality] cannot shield itself from § 1983 liability by contracting out its duty to provide medical services."). But Ms. Rayne provides no authority for the proposition that a policy giving nurses discretion to contact a nurse practitioner or physician for further treatment expressly violated her constitutional rights when enforced. *See City of Canton,* 489 U.S. at 386–87 (stating that there "can be little doubt" that a jail's policy to take an inmate who needs medical care to a hospital for medical treatment, with permission of a supervisor, is constitutional on its face). Moreover, she has not designated evidence of custom and practice to permit an inference that the Sheriff's Department had chosen an impermissible way of operating. *Calhoun v. Ramsey*, 408 F.3d 375, 381 (7th Cir. 2005). A paramedic's vague statement that there have been individuals in the Jail that should have received a higher level of care long before he or any other paramedic was called to the scene, dkt. 119, is insufficient.

Ms. Rayne also contends that the Jail failed to implement policies under which Jail staff could coordinate information about inmate care and policies that allow for jail staff to obtain additional treatment for inmates when the

inmate is not receiving substantive treatment.  Dkt. 147 at 9-15.  But Ms.
Rayne has not designated evidence that this lack of policy was the "moving
force" behind her pain or lack of treatment.  *See Bd. of the Comm'rs of Bryan
Cty. v. Brown*, 520 U.S. 397, 404 (1997); *Glisson v. Ind. Dept. of Corr.*, 849 F.3d
372, 379 (7th Cir. 2017).  Indeed, jail staff are entitled to defer to medical
professionals regarding inmate care.  *See Berry v. Peterman*, 604 F.3d 435, 440
(7th Cir. 2010) (underscoring that the law "encourages non-medical security
and administrative personnel . . . to defer to the professional medical
judgments of the physicians and nurses treating the prisoners in their care
without fear of liability for doing so.").

Furthermore, to the extent that she argues that medical staff were not
required to look at OMS records maintained by the deputies or records
maintained by mental health staff, dkt. 147 at 14, Ms. Rayne does not
designate any evidence that this lack of requirement was the "direct causal
link" for her treatment at the Jail.  *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S.
397, 404 (1997).  "It is when execution of [an entity's] . . . custom . . . inflicts
the injury that the [entity] . . . is responsible under § 1983."  *Monell v. Dept. of
Social Servs.*, 436 U.S. 658, 694 (1978).  Ms. Rayne only asserts that, if
medical staff was required to look at OMS records, different actors within the
jail could "put together the overall picture of the inmate's health."  Dkt. 147 at
15.  The problem here was that medical staff may have either ignored
information about Ms. Rayne's condition and her symptoms or made decisions

26

without first reviewing information that was readily available to them.  Review of OMS records would not have remedied this problem.

### 3. The Sheriff's Failure to Train

Ms. Rayne argues that jail staff encounter medical issues every day, but they receive zero training on medical issues outside of CPR and tourniquets, including how to identify a possible medical issue or whether an inmate needs treatment.  Dkt. 147 at 16.

Sheriff Layton argues that jail staff were aware of the significant rate of substance abuse, alcohol abuse, mental health problems, and other medical problems than the general population, and that the Sheriff's Department contracts with outside medical providers so that inmates receive timely, quality medical care.  Dkt. 126 at 36.  He contends that Ms. Rayne cannot show that any untrained employee had notice that training was deficient.  *Id.* at 36-37.

Establishing *Monell* liability based on evidence of inadequate training or supervision requires proof of "deliberate indifference" on the part of the local government.  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997) (requiring deliberate indifference for a finding of municipal liability under § 1983).  Deliberate indifference exists where the defendant (1) failed "to provide adequate training in light of foreseeable consequences"; or (2) failed "to act in response to repeated complaints of constitutional violations by its officers." *Miranda*, 900 F.3d at 345 (quoting *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006)).  The alleged failure to train or supervise must be closely

27

related to the ultimate injury and the plaintiff must "prove that the deficiency in training actually caused [the constitutional violation]." *City of Canton*, 489 U.S. at 388.  To meet this test, the plaintiff must show "that the defendants were on notice of constitutional violations committed by their inadequately trained employees." *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994).

Other than conclusory assertions, Ms. Rayne has offered no evidence that the Sheriff had notice of constitutional violations being committed by jail staff.  Indeed, there is no evidence that any other inmate had suffered from serious pain from a failure to secure proper medical attention, including complications from MRSA.  *See Hirsch*, 40 F.3d at 905.  Moreover, Ms. Rayne's argument that the Sheriff should have provided more training "would ignore the training the officers did receive." *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997) (rejecting the "no special training= deficient training" argument); *Erwin v. Cty. of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989) (plaintiffs cannot prevail merely by proving that injury could have been avoided had officer received enhanced training).

Accordingly, Sheriff Layton is **granted** summary judgment.  Dkt. [125].

## IV.
## Conclusion

William Gannon and Sheriff John Layton's motions for summary judgment are **GRANTED**.  Dkt. [123]; dkt. [125].

The Medical Defendants' motion for summary judgment is **GRANTED in part and DENIED in part**.  Dkt. [130].  Dr. Buller, Nurse Pierce, and Nurse

Hubbard are entitled to summary judgment; the **clerk is directed** to terminate them from the docket.

Ms. Rayne's motion for summary judgment is **DENIED**.  Dkt. [118].

No final judgment shall issue at this time because of the pending claims against Nurse Allen, Nurse Carter, Nurse Gebresilassie, Nurse Jones, Nurse Marble, and Nurse Practitioner Petty.

**SO ORDERED.**

Date: 6/1/2020

Distribution:

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Scott Leroy Barnhart
ATTORNEY AT LAW
Scott.Barnhart@atg.in.gov

Andrea Lynn Ciobanu
CIOBANU LAW, PC
aciobanu@ciobanulaw.com

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Christopher Andrew Farrington
BLEEKE DILLON CRANDALL ATTORNEYS
drew@bleekedilloncrandall.com

Tara Lynn Gerber
City of Indianapolis
tara.gerber@indy.gov

Grant E. Helms
OFFICE OF CORPORATION COUNSEL
grant.helms@indy.gov

Lauren Nicole Hodge
OFFICE OF CORPORATION COUNSEL
lauren.hodge@indy.gov

Benjamin Myron Lane Jones
INDIANA ATTORNEY GENERAL
benjamin.jones@atg.in.gov

Bradley A. Keffer
KEFFER HIRSCHAUER LLP
keffer@khindy.com

Joshua Robert Lowry
INDIANA ATTORNEY GENERAL
joshua.lowry@atg.in.gov

Mollie Ann Slinker
INDIANA ATTORNEY GENERAL
mollie.slinker@atg.in.gov

Brooke Smith
KEFFER HIRSCHAUER LLP
Smith@KHindy.com